IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID M. ARSHAM, | ) | Case No. 5:22-CV-01465 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, David M. Arsham, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in explaining his reasons for rejecting Arsham's subjective symptom complaints, the Commissioner's final decision denying Arsham's application for DIB must be vacated and Arsham's case must be remanded for further consideration.

**I.      Procedural History**

On March 9, 2020, Arsham applied for DIB.  (Tr. 232).[1]  Arsham alleged that he became disabled on October 2, 2015 due to: (i) Lyme disease, (ii) dysautonomia/ postural orthostatic tachycardia syndrome ("POTS"); (iii) small fiber neuropathy; (iv) gastroparesis; (v) hypothyroidism; (vi) concentration issues; (vii) sleep problems; and (viii) fatigue.  (Tr. 247,

---

[1] The administrative transcript is available at ECF Doc. 5.

268).  The Social Security Administration denied his application initially and upon reconsideration.  (Tr. 152-157, 159-167).

On January 29, 2021, ALJ Michael Schmitz heard Arsham's case telephonically and denied his application in a March 11, 2021 decision.  (Tr. 16-28, 36-63).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Arsham had the RFC to perform light work, with the following limitations:

> [Arsham] could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs, stoop, crouch and crawl.  He could frequently balance and kneel.  [Arsham] must avoid concentrated exposure to extreme cold and loud noise, and he must avoid all exposure to hazards such as unprotected heights, moving mechanical parts and commercial driving.  He could perform simple, routine and repetitive tasks, but he could not perform tasks which require a high production rate pace such as assembly line work.  He could interact on an occasional basis with supervisors, coworkers and the general public, but should be limited to superficial contact meaning no sales, arbitration, negotiation, conflict resolution or confrontation, no group, tandem or collaborative tasks, and no management, direction or persuasion of others.  He could respond appropriately to occasional change in a routine work setting, as long as any such changes are easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 20).

On June 13, 2022, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  And, on August 17, 2022, Arsham filed a complaint to obtain judicial review.  ECF Doc. 1.[2]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Arsham was born on October 2, 1994 and was 21 years old on the alleged onset date. (Tr. 243).  He completed his GED in 2015 and had previously worked as a musician.  (Tr. 248).

---

[2] This matter is before the court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

### B.   Relevant Medical Evidence

Arsham limited his challenge to the ALJ's evaluation of his physical impairments; thus, it is only necessary to summarize the evidence related to his physical conditions. *See generally* ECF Doc. 9.

On October 23, 2015, Arsham spoke with Cheryl Leuthaeuser, D.O., about his medication for his POTS, history of Lyme disease, and hypothyroidism.  (Tr. 313). Dr. Leuthaeuser instructed Arsham to double his vitamin D dosage.  *Id.*

On March 4, 2016, Arsham saw Dr. Leuthaeuser, noting that he played his guitar at his father's restaurant twice a week and had been experiencing cold symptoms (a mild cough and chills) for the prior month.  (Tr. 312, 314).  Dr. Leuthaeuser noted he was afebrile and had nasal erythema.  (Tr. 312).  Dr. Leuthaeuser diagnosed Arsham with sinusitis, POTS, and constipation, and prescribed him Mucinex.  *Id.*  Arsham later reported that the Mucinex had not improved his symptoms, and he still had pressure in his head and behind his ears and eyes.  (Tr. 311).

On March 28, 2016, Arsham arrived at the emergency room, complaining of palpitations, dizziness, and a month-long sinus infection.  (Tr. 1092).  Arsham recounted his history of POTS and hypothyroidism, and indicated he had the following symptoms: dizziness, balance issues (prior to starting sinus infection medication), and lightheadedness.  (Tr. 1092-1093).  Staff noted that Arsham had associated tachycardia, chest tightness, and numbness/tingling in his extremities, but was currently asymptomatic.  (Tr. 1093).  The antibiotics for his sinus infection had not helped.  *Id.*  A review of his systems and physical examination were unremarkable, save for those same complaints Arsham had identified.  (Tr. 1094).  A chest x-ray indicated Arsham did not have any active cardiopulmonary disease.  (Tr. 340, 1095).  A CT scan showed moderate sinusitis.  (Tr. 337-338, 1094).  He was diagnosed with dizziness, palpitations, subacute sinusitis,

3

and right otitis media.  *Id.*  The hospital discharged Arsham in stable condition, prescribed Bactrim, and instructed him to set up a follow-up appointment.  (Tr. 1094-1095).

On April 13, 2016, Arsham had a consultation for nasal congestion.  (Tr. 1090).  Arsham reported experiencing nasal congestion for six weeks, that antibiotics had not helped, and the congestion impacted his hearing.  *Id.*  A physical examination of his ears did not show any evidence of effusion or infection, and it was noted that he had a deviated septum.  (Tr. 1091).  He was assessed with nasal congestion, allergic rhinitis, general unsteadiness, and ear fullness; and was prescribed Medrol and Flonase.  *Id.*  Arsham also underwent an audiologic evaluation that indicated his hearing was within normal limits.  (Tr. 1089).

On April 14, 2016, Arsham saw Dr. Leuthaeuser, who recommended that he take the Medrol, if the Flonase did not help.  (Tr. 310).

On April 25, 2016, Arsham saw Edward Fine, M.D., Ph.D., for acute sinusitis. (Tr. 1087).  Arsham reported chronic sinusitis since January 2016, taking three rounds of antibiotics without relief, and concerns with loss of hearing and smell.  *Id.*  He also reported facial pain/pressure, dizziness, nasal congestion, ear congestion, ear fullness, ear pressure, and orbital pressure.  *Id.*  A review of his systems was consistent with his complaints.  (Tr. 1088). Dr. Fine's physical examination observations were unremarkable.  *Id.*  Dr. Fine found a nasal polyp and that Arsham had a deviated septum and severe hypertrophy.  *Id.*

On May 9, 2016, Arsham underwent vestibular testing, which produced normal findings except for bilateral prolongation of certain tested eye movements.[3] Dr. Fine noted that migraine disorders should be considered.  (Tr. 888, 1086).

---

[3] Optokinetic after-nystagmus (OKAN) testing.

On May 17 and 20, 2016, Arsham saw Dr. Leuthaeuser.  (Tr. 309-310).  During the May 17 session, Arsham reported concerns over thyroid nodules, and Dr. Leuthaeuser assessed him with sinusitis and possible atypical migraines, noting consideration of betablocker medication.  (Tr. 309).  On May 20, Arsham complained of dizziness and feeling "disconnected."  (Tr. 310).  Dr. Leuthaeuser noted his vestibular testing and possible migraine triggers.  *Id*.

On June 21, 2016, Arsham went to the emergency room for palpitations, hypertension, and occasional dizziness.  (Tr. 1082).  He reported having sinus issues since March and not yet returning to his "normal self."  (Tr. 1083).  A review of his system was unremarkable, save for a rash, dizziness, and light-headedness.  (Tr. 1083-1084).  Arsham's physical examination results were unremarkable.  (Tr. 1084).  Staff discharged Arsham in stable condition.  (Tr. 1085).

On June 23, 2016, Arsham was seen by Cheryl Hammes, D.O.  (Tr. 308).  Dr. Hammes noted Arsham was alert and had hives on his back, and she assessed him with acute urticaria, POTS, and atypical migraines.  *Id.*

On June 28, 2016, Arsham had a consultation with otoneurologist, Neil Cherian, M.D. (Tr. 1075-1074, 1082).  Arsham complained of dizziness, lightheadedness/ "disconnected," imbalance, elevated blood pressure, and fatigue.  (Tr. 1076).  Dr. Cherian's impression was that Arsham's current systems appeared to be impacted by an upper respiratory infection in February and he noted a possible peripheral vestibular disturbance and evidence of thoracic spine dysfunction.  *Id.*  A review of Arsham's systems indicated he had generalized weakness (mostly in his legs); patches of a burning sensation; constipation; chronic photophobia; sporadic, sharp chest pain a couple of times a week, and shortness of breath with the pain.  (Tr. 1078). Dr. Cherian's physical examination observations were, generally, unremarkable, save for some

reduced movement in Arsham's spine.  (Tr. 1080-1082).  Dr. Cherian recommended Arsham

undergo additional testing, start magnesium, and start physical therapy.  (Tr. 1076).

On August 4, 2011, Arsham tested negative for "cat scratch disease."[4]  (Tr. 349).

On August 2, 2016, Arsham saw James Fernandez, M.D., Ph.D.  (Tr. 1071, 1074).

Arsham reported a history of POTS, leg and arm muscle pain, recurrent sinusitis, brain

fog/confusion during "down spells," and worsening  of his symptoms with overexertion.

(Tr. 1071-1072).  He also noted that he felt fatigued almost daily, but the fatigue fluctuated in its

severity.  (Tr. 1071).  A review of Arsham's systems indicated he had fatigue, facial pain,

shortness of breath, and abdominal discomfort.  (Tr. 1073).  Dr. Fernandez's observations on

physical examination were, largely, unremarkable.  *Id.*  He assessed Arsham with chronic

fatigue, chronic ethmoidal sinusitis, dizziness and giddiness, POTS, and allergic rhinitis due to

pollen.  (Tr. 1074).

On August 8, 2016, Arsham was seen at the Cleveland Clinic for POTS.

(Tr. 1067-1068).  He reported being diagnosed with POTS in 2007 and stated he "had been

stable by way of symptoms for the past few years, [but felt] he ha[d] been sick his entire life."

(Tr. 1068).  But for the prior five months, Arsham had a sinus infection and ever since felt

poorly, experiencing fatigue, weakness, aching, and tachypalpitations.  *Id.* Arsham's review of

systems was, generally, consistent with his complaints, and his physical examination results were

unremarkable.  (Tr. 1069-1070).  It was recommended that he try structured exercise or cardiac

rehabilitation, after which he could consider betablocker medication.  (Tr. 1071).

---

[4]Bartonella antibody test is a blood test that tests for exposure for the bacteria which causes "cat scratch" disease.  Bartonella Antibody, University of Rochester Medical Center Health Encyclopedia, available at https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=167&contentid=bartonella_ant ibodies (last accessed April 21, 2023).

While at the Cleveland Clinic, Arsham saw Kenneth Mayuga, M.D., for evaluation and treatment options. (Tr. 320-321). Arsham reported that, about six months earlier, he had a sinus infection for which he received three different courses of antibiotics. (Tr. 320). He felt that he had not recovered and that his symptoms – lightheadedness, feeling disconnected, an inability to think straight, ear and nose pressure, decreased hearing, gastric emptying issues, "light" chest pain, shortness of breath, fatigue, occasional episodes of syncope, and heart racing – had worsened. *Id.* Dr. Mayuga recommended cardiac rehabilitation. (Tr. 322).

On August 22, 2016, Arsham saw Dr. Leuthaeuser. (Tr. 309). He reported that he went to the hospital for a racing heart and hives, which improved with medication. *Id.*

On October 5, 2016, Arsham was seen for his nasal congestion and a nasal polyp. (Tr. 1065). Arsham's physical examination was unremarkable, save for his deviated septum and mild congestion. (Tr. 1065-1066). Because he had not benefited from nasal steroids, it was recommended that he started a Medrol Dosepak. (Tr. 1065).

On December 2, 2016, Arsham was seen by Mary Wilson, CNP. (Tr. 1059). Arsham reported that he had never felt well, noting his history of POTS, hypothyroidism, Lyme disease and frequent sickness as a child. (Tr. 1057, 1060). He reported waking up around 9 AM, being in the bathroom for about an hour, having lunch, listening to music or reading, showering but then showering again because of a strange body odor, eating dinner, and trying to relax. *Id.* Arsham's physical examination was unremarkable. (Tr. 1061-1062). Wilson prescribed him magnesium and suggested various lifestyle changes. (Tr. 1063). Arsham also saw a nutritional therapist, who instructed him on nutritional changes he could make. (Tr. 1056-1058).

On January 17, 2017, Arsham saw Wilson, reporting that he'd had a few good weeks around Christmas, but then "crashed." (Tr. 1052). He noted having head sores and taking

melatonin but felt groggy in the morning and snored.  *Id.*  Wilson assessed Arsham with irritable bowel syndrome ("IBS"), vitamin D deficiency, chronic fatigue, adverse food reactions, and hyperinsulinemia.  (Tr. 1055).  Wilson prescribed A-Myco and other medications.  *Id.*

On March 21, 2017, Arsham saw Wilson and reported feeling terrible after taking the A-Myco but having good sleep patterns.  (Tr. 1043-1044).  Wilson instructed him to "loosen the reins" with his food and to start two medications.  (Tr. 1044)*.*  In addition to her prior assessments, Wilson added gastroesophageal reflux disease ("GERD"), insomnia, constipation, bloating, and food allergies.  (Tr. 1045).  In a nutritional reassessment, it was noted Arsham had altered GI function related to IBS, and he was instructed on dietary changes.  (Tr. 1040-1043).

On June 16, 2017, Arsham tested positive on a Western Blot test for Lyme disease. (Tr. 350-352).

On June 27, 2017, Arsham saw Wilson, indicating he felt the same.  (Tr. 1035).  He reported the same congestion, not having night sweats, being "off the rails" with his eating, and losing a few pounds.  (Tr. 1036).  Wilson instructed him to start another supplement and noted that the magnesium helped with his constipation.  (Tr. 1038).

On September 25, 2017, Arsham saw Phillip DeMio, M.D.[5]  (Tr. 433-435, 566, 726-729). Dr. DiMio noted that Arsham's symptoms were chronic, and Arsham had fatigue, exhaustion, dark circles, and constipation.  *Id.*  He prescribed IV nutrients.  *Id.*

On October 31, 2017, Arsham saw Wilson, reporting he started new medications and was tolerating them well, except for his bad reaction to Bactrim.  (Tr. 1030).  His appetite and sleep were the same, except he lost his appetite with Keflex, and he played at his dad's restaurant

---

[5] The treatment notes from Dr. DeMio are nearly indecipherable because of poor legibility.  The court has made its best effort at included those where Dr. DeMio's notes were at least partially comprehensible.

twice a week.  *Id.*  Wilson's assessments were, generally, the same as their prior visit, and she instructed Arsham on ways to help his sleep, exercise, and managing his stress.  (Tr. 1032-1033).

On November 7, 2017, Arsham returned to Dr. DiMio.  (Tr. 730-734).  Arsham reported some mild improvement, and Dr. DiMio noted that lab reports indicated "toxic/GI/ + metabolic problems."  *Id.*  He prescribed various medications to Arsham.  *Id.*

On December 5, 2017, February 6, 2018, and March 20, 2018, Arsham saw or spoke with Dr. DiMio.  (Tr. 448-450, 477-478, 735-738, 744-751).  Until March, Arsham reported he had little to no improvement in his condition.  (Tr. 448-449, 735-738, 744-748).  In February, Arsham noted he had a bad reaction to some of the medication, and also experienced constipation, perspiration issues, and worsening tightness in his shoulders and neck. (Tr. 448-449, 473-475, 744-748).  In March, however, Arsham reported that his mental clarity had improved, despite his other symptoms worsening.  (Tr. 477-478, 749-751).

From April 9 to April 28, 2018, Arsham saw Dr. DiMio almost daily; it appears the majority of their appointments were focused on monitoring Arsham's fluctuating blood pressure and heart rate.  (*See* Tr. 456-457, 479-519, 525-528, 760-794).

From May 2 to November 13, 2018, Arsham saw or spoke with Dr. DiMio about twice a month.  (Tr. 421-450, 454-455, 466-472, 529, 531-532, 565, 570-571, 796-798, 800-857).  Arsham, generally, reported feeling poorly and described varying symptoms that included heartburn, recurrent GERDs, brain fog, perspiration, flu-like symptoms, fatigue/tiredness, sleep issues, and GI issues.  *Id.*  Only during his July 12 appointment, did Arsham report feeling improved and was noted as being bright, more connected, and less anxious.  (Tr. 812-813).  Dr. DiMio would generally adjust Arsham's medication.  *Id.*

On December 28, 2018, Arsham underwent a brain MRI that showed no intracranial abnormality and mild scattered opacification of the paranasal sinuses, similar to the CT scan of his sinus in March 2016.  (Tr. 580-581).

On January 14, 2019, Arsham saw Dr. DiMio, reporting he was worse, experienced a panic attack-like episode 10 days earlier, and had a fluctuating heart rate, tight shoulders, anxiety, and itchiness.  (Tr. 860-866).  Dr. DiMio assessed Arsham with sinusitis.  (Tr. 864).

On January 26, 2019, Arsham saw Dr. Fine regarding his chronic rhinitis.  (Tr. 891). Arsham reported worsening sinus problems, and Dr. Fine noted Arsham had a cough, ear pressure, and a runny nose.  *Id.*  Arsham's physical examination was, generally, unremarkable. *Id.*  Dr. Fine assessed Arsham with recurrent sinusitis and chronic rhinitis.  (Tr. 892).

On January 28, 2019, Arsham saw Dr. Fine.  (Tr. 1025).  Dr. Fine reviewed Arsham's MRI, and Arsham's physical examination was, largely, unremarkable.  (Tr. 1025-1026). Dr. Fine's impression was that Arsham had recurrent sinusitis and chronic rhinitis, and he sent orders for cultures to be taken, which came back negative.  (Tr. 1024-1026).

On February 8, 2019, Arsham was seen at the emergency room.  (Tr. 898).  He came in for evaluation of his hypertension, noting that his blood pressure had been elevated for the past two days and he had a cough for two days.  *Id.*  He confirmed intermittent dysuria and noted a tingling feeling in his chest.  *Id.*  A review of his systems indicated he had chest tingling, a cough, and dysuria.  *Id.*  On physical examination, he was alert, oriented, cooperative, his hearing was grossly intact, and was otherwise unremarkable.  (Tr. 898-899).  Following several labs, Arsham was given Tylenol and saline, after which he reported having difficulty breathing. (Tr. 899).  No edema in his throat was observed and D-Dimer and a CT angiogram (Tr. 903-905) were ordered.  (Tr. 899).  The CT scan did not show any evidence of pulmonary embolism.  *Id.*

Arsham reported feeling better and his symptoms were attributed to a viral illness.  *Id.*  The overall impression was that he was dehydrated and had viral syndrome and near syncope; he was discharged with Tylenol.  *Id.*

On April 8, 2019, Arsham saw Valerie Hadam, M.D., for an endocrine consult regarding his thyroid.  (Tr. 908).  He reported a three-month history of "spells," that he had been unwell all of his life, and was on long-standing antibiotics (which he was now off) and hydrocortisone for about two years.  *Id.*  He described his "spells" as burning and tingling throughout his skin, chills, shakiness, and an upset stomach.  *Id.*  The flare ups would occur daily and could last from a few minutes to a few hours.  *Id.*  He noted his prior diagnoses of POTS and use of a betablocker, which he felt helped his symptoms.  *Id.*  A review of his systems and physical examination results were unremarkable.  (Tr. 909-910).  Dr. Hadam recommended stopping the hydrocortisone and, after additional testing, would make further suggestions.  (Tr. 911).  The following day, Arsham received a cortrosyn injection into his left deltoid.  (Tr. 912).

On June 12, 2019, Arsham had unremarkable x-rays of his spine.  (Tr. 963).

On July 25, 2019, Arsham saw Scott Higley, D.O.  (Tr. 1023-1024).  He reported a history of POTS, a "remote" history of Lyme disease, and chronic fatigue.  (Tr. 1023)*.*  He noted that he was tired, had sleep issues, never felt rested, and was on Cymbalta, Focalin, and a lower dose of thyroid medication.  *Id.*  A review of his systems was unremarkable, except for fatigue.  (Tr. 1024).  His physical examination results were also unremarkable.  *Id.*  He was assessed with hypothyroidism and dermatitis.  *Id*.

On September 6, 2019, Arsham had a skin biopsy, which indicated he had spongiotic dermatitis.  (Tr. 982).

On September 13, 2019, Arsham was seen for a sore throat.  (Tr. 1020).  He noted having a fever for the preceding three to four days, pain that was 5/10, congestion, and coughing.  *Id.*  A review of his systems indicated he was positive for congestion, postnasal drip, sinus pressure, a sore throat, and cough.  (Tr. 1020-1021).  His physical exam was, generally, unremarkable, save for rhinorrhea and postnasal drainage.  (Tr. 1021).  He was assessed with an acute URI.  *Id.*

On October 7, 2019, Arsham saw Dr. Hadam for a follow-up appointment.  (Tr. 914). Arsham reported that he was feeling better since his last visit, he had a new neurologist, and was on Cymbalta and Focalin and feeling more like himself.  *Id.*  His physical examination was unremarkable.  (Tr. 915-916).

On October 24, 2019, Arsham saw neurologist Brendan Bauer, M.D., for dysautonomia and lumbar radiculopathy.  (Tr. 1005).  Arsham reported numbness and tingling in his lower extremities, an episode of syncope, a history of POTS, and EMG testing which showed left radiculopathy, for which he was given a home exercise program and physical therapy.  *Id.*  He reported that he still had weakness when walking and ambulating.  *Id.*  A review of his systems indicated he had black out spells, tingling/numbness, tingling in his feet, leg weakness, and back pain.  *Id.*  Arsham's physical examination results were, generally, unremarkable, with his motor functioning being 4/5 or 5/5 but he had decreased sensation to light touch and zero ankle reflex in his left leg.  (Tr. 1005-1006).  Dr. Bauer assessed Arsham with lumbar radiculopathy and dysautonomia, and recommended that he have an MRI of his lumbar spine.  (Tr. 1006).

On November 4, 2019, Arsham underwent an MRI of his lumbar spine, which indicated minimal disc bulging at one disc, but no evidence of central canal or foraminal stenosis and was otherwise unremarkable.  (Tr. 998-999).

On December 19, 2019, Arsham saw Dr. Higley, who reviewed Arsham's MRI. (Tr. 979). Arsham noted that his Cymbalta and Focalin were doing "ok" for dysautonomia, he had minor leg pain, and his biggest problems were bladder sensations and urges to urinate. *Id.* A review of his systems was unremarkable except for his urinary symptoms and back pain. (Tr. 980-981). His physical examination results were unremarkable. *Id.* He was instructed to consult a urologist. (Tr. 981).

On January 22, 2020, Arsham saw a urologist with voiding complaints and pain in his hips and pelvis/groin. (Tr. 1015). A review of his systems and physical examination were unremarkable. (Tr. 1016-1017). Arsham was assessed with chronic pain and would be reevaluated once his neurology issues were resolved. (Tr. 1017).

On February 12, 2020, Arsham saw Dr. Bauer. (Tr. 993). Arsham reported back pain near his tail bone; numbness and tingling in both legs (mostly in his left leg); worsening fatigue; electrical sensation burning/tingling throughout his body but mostly in his spine, waist, and thighs; GI issues; occasional lightheadedness. *Id.* Arsham's physical examination was largely unremarkable, with his range of motion being noted as either 4/5 or 5/5 and a decreased sensation to light touch in his extremities. (Tr. 993-994). Dr. Bauer assessed him with dysautonomia and lumbar radiculopathy. (Tr. 994).

On June 12, 2020, Arsham messaged Dr. Higley, writing:

> Dr. Bauer and I have done a lot of trial and error with medication for the neuro symptoms since I last spoke with you. . . . I'm on the same dose of Cymbalta (increasing to 30 mg was worse) and the same does of Focalin. After several other meds that ultimately didn't help or made things worse, we added Nortriptyline which has noticeably been helping the nerve symptoms and in particular really seems to be helping my GI. The problem is that while the nerve symptoms have slowly been going in the right direction, I've been getting more and more tired. Not necessarily my usual fatigue and "sick" feeling, but just plain tiredness and feeling like I need way more sleep. I'm wondering if my thyroid is playing a part in that.

(Tr. 1472). Dr. Higley thought that the Nortriptyline caused the fatigue because Arsham's thyroid was "great" in February. *Id*.

On October 15, 2020, Arsham again messaged Dr. Higley, reporting slow but continued improvement with his neurology issues. (Tr. 1488). He indicated he had a nerve block, but he had not noticed much change and he was starting to wean off the Nortriptyline and start diclofenac gel. *Id*. Following lab work, Arsham noted that his fatigue, exhaustion, and poor temperature regulation had been "really bad" over the last few months. (Tr. 1487).

On January 27, 2021, Arsham saw Dr. Higley regarding his continued fatigue and sour stomach. (Tr. 1500). A review of his systems indicated Arsham was positive for fatigue and nausea. (Tr. 1501). His physical examination results were unremarkable. (Tr. 1502). Dr. Higley diagnosed Arsham with acute superficial gastritis without hemorrhage, malaise, and pelvic pain, and adjusted his medications. (Tr. 1503).

### C. Relevant Opinion Evidence

#### 1. Function Report – David Arsham

On June 8, 2020, Arsham completed a function report. (Tr. 260-267). He explained that his illness caused "significant fatigue" and limited his stamina. (Tr. 260). The extreme exhaustion and severe GI issues caused him to be nonfunctional for the first half of his day, followed by fatigue and weakness for the rest of the day. *Id*. As a result, his ability to focus and think can be "drastically" affected, and he would have severe urinary urgency issues . *Id*. He described his day as taking hours to wake up and get ready, and that he was "dismally limited" in his ability to do anything outside of the house, so he spent most of his day lying or sitting. (Tr. 261). He also had trouble sleeping. *Id*. He took care of a pet by feeding, cleaning, and walking it if he was capable. *Id*. Before his illness, he used to perform music and do various

activities outside of his house.  *Id.*  He had no problems taking care of his personal care and did not need reminders for that or his medicine.  (Tr. 261-262).

Arsham prepared his own meals daily, which often was cereal, frozen dinners, or if he felt well, complete meals.  (Tr. 262).  He would do dishes, laundry, and whatever limited cleaning he was able to do, but how often and how long it took him to complete the chores varied.  *Id.*  He would need encouragement to do these things and needed help if he was too weak.  *Id.*  He would go outside several times a week, could drive and ride in a car, and could go out alone, but rarely did so and, during significant flare ups in his symptoms, felt more comfortable being with someone else.  (Tr. 263).  He shopped by computer for food and other items; the length of time it took varied.  *Id.*  He hobbies included reading and listening to podcasts, but how often and how well he did so varied with his symptoms.  (Tr. 264).  His focus and stamina were often limited.  *Id.*  He would spend time with others, usually talking on the phone or texting, but he would occasionally meet for coffee or a meal.  *Id.*  How often he did so varied.  *Id.*  He was limited in the places he would go but would go to church, coffee shops, or restaurants.  *Id.*  He did not need to be reminded to go places or need someone to go with him, but if his symptoms flared up, he could need someone.  *Id.*

Arsham did not have trouble getting along with others, but his fatigue and stamina reduced his ability to participate.  (Tr. 265).  His conditions limited his ability to lift, stand, walk, sit, kneel, talk, climb stairs, recall information, concentration, and understand.  *Id.*  He explained that his "physical fatigue/weakness/achiness" limited his physical activity, especially standing, and his brain fog limited his concentration and understanding.  *Id.*  How far he could walk varied, but it was never for extended lengths, and how long he needed to rest varied.  *Id.*  His ability to pay attention also varied, but he could finish what he started.  *Id.*  On "good" days, he

15

could follow written and spoken instructions well, but had greater difficulty on bad days.  *Id.*
How well he was able to handle changes in his routine varied with his physical limits.  (Tr. 266).

### 2.    Letter – Christal Arsham, David Arsham's Mother

In an undated letter, Arsham's mother wrote about her son's conditions.  (Tr. 296-298).
She described the physical and emotional toll Arsham's conditions had on him.  *Id.*

### 3.    Lyme Disease Questionnaire – Brendan Bauer, M.D.

On January 18, 2021, Dr. Bauer completed a Lyme disease questionnaire.  (Tr. 1495).
He noted that he had been in contact with Arsham since October 9, 2019, and Arsham had been
diagnosed with Lyme disease using a Western Blot test.  *Id.*  Dr. Bauer also noted that Arsham's
small fiber neuropathy complicated his Lyme disease.  *Id.*  Dr. Bauer indicated that Arsham had
the following symptoms: flu-like symptoms, fatigue, headaches, poor memory, tingling and
numbness in hands, feet, and back; a lack of energy; sore muscles and joints; swelling and joint
pain.  *Id.*  Dr. Bauer anticipated that Arsham's Lyme disease would cause him to be absent from
work more than three times a month.  *Id.*

### 4.    Off-Task/Absenteeism Questionnaire – Brendan Bauer, M.D.

On January 18, 2021, Dr. Bauer also completed an absenteeism questionnaire.
(Tr. 1496).  He indicated that Arsham would be off-task at least 20% of the time, and that
Arsham had all of the specified reasons for why an individual may be off tasks.  *Id.*  As to
"underlying mental or physical impairments established by objective and clinical findings" that
would contribute, Dr. Bauer noted Arsham's attention deficit disorder without hyperactivity.  *Id.*
He also noted Arsham's inability to concentrate due to "ADD + pain + physical symptoms (light
headed)", and pain in Arsham's back and left leg.  *Id.*  Dr. Bauer also noted drowsiness due to
Arsham's dysautonomia and POTS, and medication side effects.  *Id.*  He specified that Arsham's

medications caused drowsiness, fatigue, constipation, and tachycardia.  *Id.*  When given the opportunity to specify other reasons, Dr. Bauer also indicated that Arsham's overwhelming fatigue and anxiety produced by his physical symptoms would contribute to his absenteeism.  *Id.*  He opined that Arsham would be absent about 4 times a month due to these impairments.  *Id.*

### 5.    State Agency Consultants

On July 8, 2020, W. Scott Bolz, M.D., reviewed the medical evidence of Arsham's physical limitations.  (Tr. 155-156).  He concluded that Arsham could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; was unlimited in his ability to push and/or pull; could stand, walk, or sit for 6 hours in an 8-hour workday, and had no postural limitations, except he could not climb ladders, ropes, or scaffolds.  (Tr. 155).  He also found that Arsham should avoid even moderate exposure to hazards but was otherwise unlimited. (Tr. 155-156).

On September 14, 2020, Elizabeth Das, M.D., reconsidered the medical evidence of Arsham's physical limitations and, generally, affirmed Dr. Bolz's findings, adding that he can only occasionally climb ramps and stairs.  (Tr. 163-164).

### D.    Relevant Testimonial Evidence

Arsham testified at the hearing.  (Tr. 43-56).  He lived with his mother and could drive, depending on the severity of his symptoms, particularly his fatigue, achiness, weakness, and brain fog.  (Tr. 43).  In a typical month, he estimated he could drive short distances on most days, and when he could not drive, he would ask a friend or family member to do so.  (Tr. 44).  He previously was self-employed as a musician but stopped when the treatment he was receiving worsened his conditions.  (Tr. 45).  He believed he could not work because of the varying symptoms he had.  *Id.*  Typically, he would have extreme fatigue, achiness, and chills; almost

daily he would experience symptoms like he had a bad case of the flu.  *Id.*  When he was working part-time, it was about all he could do and the fatigue would take several days to recover from, depending on the symptoms, and he could not do much more than sit for three hours.  (Tr. 45-46).  In 2019, he began experiencing new symptoms including stabbing pains that would travel down his neck through his spine to his legs.  (Tr. 46).

Arsham described his typical day as follows.  It generally took him an hour to get out of bed, because he felt more exhausted waking up, which was usually around 9 am.  (Tr. 47).  He would then use the bathroom for about an hour because of his GI issues.  *Id.*  He then showered, and the remainder of his day depended on his symptoms.  (Tr. 47-48).  Some days he would just stay on the couch, while others he could work at his computer.  (Tr. 48).  For hobbies, he would read when he was able to or watch something, but he did not do anything outside.  (Tr. 49).  He was able to do his own laundry, but other chores depended on how he was feeling that day. (Tr. 49-50).  How long he could stand before needing to sit down depended on the day, but it was never for very long, even on his good days.  (Tr. 51).  He could lift things like a laundry basket and a bag of groceries.  *Id.*  In relation to his thyroid, he mentioned he also had issues with temperature regulation.  (Tr. 52).

Arsham explained that he had been homeschool due to his conditions, particularly his POTS.  (Tr. 53).  He had tried a variety of treatments for his POTS, including steroids and salt tablets, exercise, cardiac rehab, and physical therapy.  (Tr. 54).  He did not really nap. (Tr. 54-55).  He noted that the stimulant medication he was currently on could be worsening his tachycardia episodes.  (Tr. 55).  He also testified that his spinal pain was "pretty constant," and it was a matter of when it flared up, because when it did so it was completely disabling.  *Id.* Figuring out the cause of his pain was the main focus of his treatment at the time of the hearing.

*Id.* The nerve block he had undergone for pain had not helped. (Tr. 55-56). He explained that, on his good days, he was careful not to overdo things because it could bring on the symptoms. (Tr. 56).

## III.   Law & Analysis

### A.   Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009). Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020). However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009). Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.   Step Three: Medical Listing

Arsham contends that the ALJ erred by failing to explain why his chronic fatigue syndrome ("CFS") did not medically equal Listing 14.06B; and the error requires remand because there is a substantial question as to whether he meets the listing. ECF Doc. 9 at 14-19. Should the court order a remand, he requests that the court do so with instructions that a medical expert on CFS be called. ECF Doc. 9 at 19.

The Commissioner disagrees, contending that Arsham failed to argue that he met Listing 14.06B either before the ALJ or the Appeals Council and, thus, the ALJ was not obligated to discuss it.  ECF Doc. 11 at 8-9.  The Commissioner also argues that even if the ALJ erred, it was harmless because the record does not raise a "substantial question" as to whether Arsham satisfied the listing.  ECF Doc. 11 at 9-14.

In his reply brief, Arsham reiterates his arguments, and contends that issue exhaustion does not apply to social security proceedings because of their inquisitorial nature, as held by the Supreme Court's decision in *Carr v. Saul*, 141 S. Ct. 1352 (2021).  ECF Doc. 13 at 1-8.

In a surreply brief, the Commissioner argues that *Carr* does not apply because it is limited to Appointments Clause challenges.  ECF Doc. 15-1 at 3-4.

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision).  The ALJ "need not discuss listings that the [claimant] clearly does not meet,

especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013).  "Where the claimant does not mention the particular Listing at the hearing before the ALJ, the Sixth Circuit has found that the ALJ is not obligated to discuss the particular Listing." *McGeever v. Comm'r Soc. Sec.*, No. 1:18-CV-0477, 2019 U.S. Dist. LEXIS 54351, at *18 (N.D. Ohio Mar. 29, 2019) (citing *Wilson v. Comm'r of Soc. Sec.*, 618 F. App'x 281, 286 (6th Cir. 2015) (*per curium*)); *see also Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) (claimant did not assert he had listed impairment at hearing, although represented by counsel).

     "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *See Sheeks*, 544 F. App'x at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).  "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42).  "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  The claimant must "show that the open question is a substantial one that justifies a remand." *Sheeks*, 544 F. App'x at 641 (emphasis in original).  "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Smith-Johnson*, 579 F. App'x at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Arsham has not raised a substantial question as to whether he meets Listing 14.06B.  *See Smith-Johnson*, 579 F. App'x at 432-433.  As the Commissioner noted, Arsham did not mention his CFS – or Listing 14.06B – before the ALJ or the Appeals Council.  ECF Doc. 11 at 8-9; (*see* Tr. 36-62, 304-306).  Because Arsham failed to raise Listing 14.06B at the hearing and before the Appeals Council, the ALJ did not commit a reversible error in failing to address Listing 14.06B.  *See Wilson*, 618 F. App'x at 286; *McGeever*, 2019 U.S. Dist. LEXIS 54351, at *18.

Arsham challenges the Sixth Circuit's historic precedent, contending that the Supreme Court's decision in *Carr* rendered issue exhaustion a thing of the past for listing arguments.  This is a bridge too far, however.  In *Carr*, the Supreme Court reviewed a challenge, under the Appointments Clause, to the Social Security Administration's ALJs.  *See* 141 S. Ct. at 1357. The Supreme Court held that the plaintiffs *did not* need to exhaust their challenges to the ALJs' constitutional authority before the administrative agency.  *Id.* at 1360-1362.  However, Arsham overlooks the Court's preface to this discussion, which states "this Court has often observed that agency adjudications are generally ill suited to address *structural constitutional challenges*, which usually fall outside the adjudicators' areas of technical expertise," *id.* at 1360, a point the Court emphasized in its recent decision in *Axon Enterprise, Inc. v. FTC*, Nos. 21-86 and 21-1239, slip. op. at *4, 2023 U.S. LEXIS 1500, at *32 (Apr. 14, 2023).  Arsham's listing challenge is not such a structural challenge.  And it is not grounds for upending the Sixth Circuit's precedent regarding the claimant's obligation to raise listing arguments before the ALJ.

Further, even if the ALJ's Step Three analysis is wanting, "a court should affirm so long as the ALJ 'made sufficient factual findings elsewhere in his decision to support his conclusion at [S]tep [T]hree.'"  *Briere v. Kijakazi*, No. 1:21-CV-02323, 2023 U.S. Dist. LEXIS 55252,

at *21 (N.D. Ohio Feb. 24, 2023), *report and recommendation adopted* 2023 U.S. Dist. LEXIS 54351, (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)).

Arsham argues that the ALJ should have considered whether his CFS medically equals Listing 14.06B, which contains the following criteria:

> Repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
>> 1. Limitation of activities of daily living.
>>
>> 2. Limitation in maintaining social functioning.
>>
>> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.06B.  But the ALJ's decision, when reading the decision as a whole, provided sufficient discussion of the evidence elsewhere that supported his conclusion that Arsham did not medically equal Listing 14.06B.  Arsham contends that the ALJ's decision "did not discuss whether [his] file contained evidence of any of the constitutional symptoms or signs of CFS."  ECF Doc. 9 at 17.  The ALJ's decision, however, repeatedly acknowledged Arsham's fatigue and indications of malaise and Arsham has not provided a substantial discussion of why such statements should be disregarded.  (Tr. 21-27).

But, even if the court were to find that the evidence concerning this portion of the Listing's criteria weighed in Arsham's favor, the ALJ's discussion supported the conclusion that Arsham did not have a marked limitation in his daily living activities, the only limitation Arsham has challenged.  Throughout the decision, the ALJ discussed Arsham's activities of daily living, citing his ability to perform self-care, chores, and prior music performances at a restaurant (Tr. 20, 22, 26-27 citing 260-267, 312).  Thus, even if the ALJ should have discussed CFS at

Step Three, the error was harmless because of the ALJ's discussion of the requirements of Listing 14.06B elsewhere. *See Briere*, 2023 U.S. Dist. LEXIS 55252, at *24.

### C.      Step Four: Medical Opinion

Arsham contends that the ALJ erred in evaluating the medical opinions of Dr. Bauer by failing to adequately explain his reasoning. ECF Doc. 9 at 19-22.  He argues that the ALJ's four grounds for finding Dr. Bauer's opinion should each be rejected because they were either (i) questionable based on evidence not presented to the ALJ; (ii) failed to account for the nature of his conditions; (iii) did not consider the symptoms identified by Dr. Bauer as grounds for his opinion; or (iv) in accurate representation of Dr. Bauer's statements.  ECF Doc. 9 at 22-25.

The Commissioner argues that the ALJ properly evaluated Dr. Bauer's opinions; it notes that Arsham relies on evidence that was not presented to the ALJ to cast doubt on his evaluation (evidence which is neither new nor material), the ALJ considered the CFS evaluation criteria in SSR 14-1p, noted that symptoms are not a substitute for objective testing and clinical findings, and considered that Dr. Bauer did assess that Arsham to be disabled based on his absenteeism findings.  ECF Doc. 11 at 14-22.

In his reply brief, Arsham asserts that remand is appropriate under Sentence Four and reiterates his other arguments.  ECF Doc. 13 at 8-9.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s),

but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[6].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding Dr. Bauer's opinions unpersuasive.  *See Blakley*, 581 F.3d at 405. Because Arsham limits his challenge to the sufficiency of the ALJ's analysis, rather than the ALJ's compliance with the regulations themselves, our review can be accordingly limited.

Arsham contends that each of the four reasons given by the ALJ for finding Dr. Bauer's opinion unpersuasive is erroneous.  However, Arsham's assertions miss the mark.  Arsham contends that Dr. Bauer did treat him during the relevant period.  ECF Doc. 9 at 22.  But does so based on evidence that was not presented to the ALJ, citing Tr. 70, which was created *after* the ALJ's decision.  Moreover, Arsham has not argued for a remand under Sentence Six.  *See* ECF Doc. 9.  Thus, Arsham's contention is not well taken.  *See Bentley-Clearwood v. Berryhill*, No. 18-CV-12270, 2019 U.S. Dist. LEXIS 104238, at *24 (E.D. Mich. Jun. 3, 2019) ("The only context in which this Court may consider such post-decision evidence, is to determine whether it merits remand pursuant to sentence six of 42 U.S.C. § 405(g)").

---

[6] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

Arsham contends that the ALJ failed to compare the right objective tests to Dr. Bauer's opinion in determining its persuasiveness.  ECF Doc. 9 at 22-23.  Due to the nature of CFS, Arsham argues that the ALJ should have explicitly compared Dr. Bauer's findings to the tilt table testing Arsham underwent.  *See* ECF Doc. 9 at 23.  This argument is flawed in three regards.  First, Dr. Bauer's opinions were not exclusively about Arsham's CFS and, thus, the ALJ needed to consider their consistency and supportability in the context of the entire medical record.  Second, it is flawed because the ALJ need not cite every piece of evidence in the record.  *See Thacker v. Comm'r Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  Arsham cites Tr. 1005 and 1070 as the tilt table evidence the ALJ should have addressed.  But that evidence appears to cite a 2007 tilt test used to diagnose Arsham with POTS and, more importantly, the ALJ's decision engaged with the evidence of a positive tilt table test by discussing Dr. Mayuga's consideration of Arsham's prior test.  (*See* Tr. 22, 1005, 1070).

And third, although the ALJ specifically referenced one objective test, his statement regarding clinical examinations was addressing the medical evidence generally, stating "Clinical exams were relatively normal, although there was [examples of abnormal findings]."  (Tr. 26).  Thus, the ALJ's "failure" to compare Dr. Bauer's opinion to the tilt table test was not erroneous.

As to Arsham's contention that the ALJ erred in finding that treatment notes were inconsistent with Dr. Bauer's opinion regarding the frequency and severity of Arsham's fatigue, the ALJ's reasoning is murky at best on the issue.  In both opinions, Dr. Bauer cited fatigue as a symptom of Arsham's conditions.  (Tr. 1465-1466).  However, that is all Dr. Bauer stated.  He did not identify any other functional limitation stemming directly from Arsham's fatigue; so it is unclear what severity or frequency opinions the ALJ rejected.  Even if the court were to find this to be an error, however, because of the other reasoning the ALJ provided, the ALJ's conclusion

that Dr. Bauer's opinion was unpersuasive would remain supported.  *See Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (citations omitted)).

Arsham further contends that the ALJ's finding that Dr. Bauer, by citing his own diagnoses, failed to provide objective evidence and clinical examinations in support of his opinions was erroneous.  ECF Doc. 9 at 23-24.  In at least one respect, Arsham is correct.  Dr. Bauer cited a Western Blot test to support Arsham's Lyme disease diagnosis.  (Tr. 1495).  However, in all other regards, the ALJ did not err.  The regulations require the citation of objective evidence to support medical opinions.  *See* 20 C.F.R. § 404.1520c(c)(1).  And diagnoses and symptoms – without objective support – fail to meet the supportability standard.  *See Wassam v. Comm'r of Soc. Sec.*, No. 5:21-CV-01695, 2022 U.S. Dist. LEXIS 158329, at *39 (N.D. Ohio Jun. 7, 2022) ("the ALJ explained that Dr. Pakeeree's opinion was unsupported because it consisted of a general listing of Wassam's diagnoses and subjective allegations, with little explanation or supporting evidence.  Consequently, the ALJ addressed the required factors of consistency and supportability." (Internal citation omitted)); *see also Howard v. Comm'r of Soc. Sec.*, No. 1:17-cv-152, 2018 U.S. Dist. LEXIS 118129, at *20 (S.D. Ohio Jul. 16, 2018) (noting that the doctor's "recitation of plaintiff's diagnoses is not a "medical opinion" under the regulation and does not provide any insight into whether plaintiff's diagnoses impacted his work-related functioning.").

Finally, the question of whether the ALJ properly rejected Dr. Bauer's opinion on absenteeism is a complicated one.  On one hand, Arsham contends that, despite the level of absenteeism being *per se* disabling, Dr. Bauer's opinion was not an opinion on an issue reserved

for the Commissioner.  ECF Doc. 9 at 24.  On the other hand, the Commissioner asks us to overlook Sixth Circuit precedent in support of Arsham and rely on the implications of an opinion (*i.e.*, that some condition would be disabling) in determining what type of opinion it is (*i.e.*, that is an opinion on disability reserved to the Commissioner).  ECF Doc. 11 at 21-22.  We need not delve into this divide, however.  Assuming the ALJ should not have rejected Dr. Bauer's argument for the reasons given, as the analysis above indicates, the ALJ's error would have been harmless because of the other reasons he provided for finding Dr. Bauer's opinions unpersuasive.  *See Fisher,* 869 F.2d at 1057.  Thus, no remand is required, as to the ALJ's medical opinions.

### D.     Step Four: Subjective Symptom Complaints

Arsham contends that the ALJ misevaluated his subjective symptom complaints by failing to identify any inconsistencies between his statements and the medical records.  ECF Doc. 9 at 26-28.  The Commissioner disagrees.  ECF Doc. 11 at 23-25.  In his reply brief, Arsham reiterates his arguments.  ECF Doc. 13 at 10.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. § 404.1520(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether he finds the claimant's subjective complaints to be consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p,

28

2016 SSR LEXIS 4 *15-19; 20 C.F.R. § 404.1529(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

Although the ALJ cited the correct legal standards, he failed to properly apply them to Arsham's subjective symptom complaints by failing to provide a specific enough explanation of *why* he found Arsham's complaints inconsistent with the medical evidence.  *See Felisky*, 35 F.3d at 1036.  Neither party focuses their arguments on the regulation's specific requirements.  Thus, the court's analysis will be circumscribed to the issue at the heart of Arsham's complaint: whether the ALJ's analysis provided a sufficient explanation of why he rejected Arsham's subjective complaints.  And here, I find that the ALJ's analysis missed the mark.

Arsham contends that the ALJ's analysis was flawed because it failed to identify any specific inconsistencies.  ECF Doc. 9 at 25-28.  Although this may be an overly rigid reading of the regulation's requirements, the core of his complaint is valid.  The ALJ in the instant case is not the first to have in some manner integrated his analysis of Arsham's complaints with his summary of the medical evidence.  *See, e.g.*, *Fauvie v. Comm'r of Soc. Sec.*, No. 4:20-CV-2750, 2022 U.S. Dist. LEXIS 87956, at *42 (N.D. Ohio Mar. 15, 2022) (noting that the ALJ's

discussion of the subjective symptom complaints was separated by a summary of the medical evidence).

Unlike some of those cases, however, here the ALJ did not provide any signals in his analysis that reflected his reasoning regarding Arsham's complaints.  The Commissioner's argument illustrates this failing.  The Commissioner contends that the ALJ "contrasts" Arsham's complaint and the medical evidence.  ECF Doc. 11 at 23-24.  But that is a *post hoc* recharacterization of the ALJ's decision.  The ALJ never used the words "but," "however," "in contrast," or any similar signals to indicate how he thought the medical evidence compared to the Arsham's complaints.  (*See* Tr. 21-27).  As a result, there is no basis for which the court or Arsham to understand the ALJ's reasons for having rejected Arsham's complaints.  This violated the regulations.  *See* SSR 16-3p, 2016 SSR LEXIS 4 *15.  Moreover, it leaves Arsham without any explanation of why his own complaints and description of his limitations was rejected, failing to provide a logical bridge between the evidence and the ALJ's conclusions.  *See Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (reasoning that the ALJ's reasoning must "build an accurate and logical bridge between the evidence and the result" (internal quotation marks omitted)).  Accordingly, remand is warranted.

## IV.    Conclusion

Because the ALJ failed to apply proper legal standards in evaluating Arsham's subjective symptom complaints, the Commissioner's final decision denying Arsham's application for DIB is vacated and that Arsham's case is remanded for further consideration.

**IT IS SO ORDERED.**

Dated: June 22, 2023

Thomas M. Parker
United States Magistrate Judge